IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re:<br><br>Todd S. Schlenker and<br>Becky M. Schlenker,<br><br>　　　　　　　　Debtors.<br>_____<br><br>Heartland State Bank,<br><br>　　　　　　　　Plaintiff,<br><br>　-vs-<br><br>Todd S. Schlenker,<br><br>　　　　　　　　Defendants. | Bankruptcy No. 10-30739<br>Adversary No. 10-07026<br><br>**Memorandum and Order Granting**<br>**in Part and Denying in Part**<br>**Discharge of Indebtedness** |

### I. INTRODUCTION

Before the Court is Heartland State Bank's (hereafter "Heartland") adversary action against debtor Todd Schlenker, which seeks a determination that two lines of credit obtained by Hill & Zachrison doing business as Uncle Bob's (hereafter "Uncle Bob's") and which were personally guaranteed by Schlenker are non-dischargeable in Schlenker's personal bankruptcy. It also seeks a determination that certain credit card debt incurred by Schlenker on a card issued by Heartland is non-dischargeable. Because the record establishes that Schlenker adopted financial statements that were materially false and relied upon by Heartland and because the evidence establishes that Schlenker did so at different times with and without an intent to deceive

1

Heartland, Discharge is GRANTED as to the Promissory Note dated January 8, 2009 and Discharge is DENIED as to the Promissory Note dated April 16, 2009. Because the evidence is insufficient to carry Heartland's burden of proof on its objection to the credit card discharge, discharge of the credit card debt is GRANTED.

## II. FACTS

In the fall of 2008 and in the midst of the economic collapse which led to the Great Recession, Schlenker purchased all of the shares of Uncle Bob's from his cousin Marty Zachrison. Uncle Bob's was a corporation engaged in the business of selling trailers located in Jamestown, North Dakota. Prior to the purchase, Schlenker was employed by Uncle Bob's as a salesman. Under the terms of the agreement, Schlenker agreed to pay Zachrison $150,000 and assumed the business's indebtedness to General Electric Credit Corporation (hereafter "GE Credit"). GE Credit had floor plan financing in place that covered virtually all of the inventory of trailers held by Uncle Bob's.

Zachrison provided information to Schlenker that the company had a value in excess of a million dollars but because of his desire to help out Schlenker and his family, he was willing to part with the company for $150,000. Schlenker did not have sufficient capital to purchase or operate the company. Zachrison told Schlenker that he would help him take care of the financing. Unbeknown to Schlenker, Uncle Bob's was teetering on the brink of extinction and its GE Credit floor plan was in jeopardy of being pulled. Schlenker was aware of some problems with inventory financing, but he had been led to believe by Zachrison that bringing a new owner into the mix would solve the problem. Schlenker was to be that solution.

Contacts were made with Heartland, who had no prior relationship with Schlenker,

2

Zachrison or Uncle Bob's. Zachrison told Heartland the company was "profitable" but because of the credit crisis they were looking for a new partner to finance their inventory financing. Heartland was generally familiar with Uncle Bob's and considered the business to be a well established player in the regional trailer sales market. Heartland was interested in receiving an application from the company.

In order to finance the purchase and operate Uncle Bob's, Schlenker applied for a $400,000 line of credit from Heartland. To complete the loan application, Schlenker provided Heartland with his personal financial statement, Uncle Bob's financial statement, and an inventory list for Uncle Bob's.

Schlenker is an unsophisticated businessman who relied upon Zachrison for assistance in completing the necessary paperwork. It seems very unlikely that Schlenker had the wherewithal to arrange the financing unassisted. Schlenker honestly believed his cousin was trying to help him out by giving him an opportunity to be in business for himself. He also believed the sale was in the best interests of the company. Zachrison fed these illusions and completed the necessary documents and presented them to Heartland.

The inventory list in particular wildly over stated the value of Uncle Bob's interest in the inventory—claiming hundreds of thousands of dollars of inventory was free and clear from GE Credit's floor plan arrangement. Uncle Bob's claimed its inventory included hundreds of thousands of dollars of inventory consigned to Big R, a trailer dealer in South Dakota. In fact this "inventory" was not "consigned" to Big R—it was owned by Big R. Schlenker testified, and the Court believes, that he relied on Zachrison's "expertise" and that at this point Schlenker did not know the representations being made were false.

Based on the representations, Heartland approved the $400,000 line of credit. Schlenker drew against the line of credit, using $150,000 to pay Zachrison and the rest to operate Uncle Bob's. As of March 11, 2011 the amount due and owing on the first line of credit was $321,000 in principal and $22,998.07 in interest.

In April of 2009, Schlenker sought a second loan from Heartland in the amount of $350,000. Heartland requested, and Schlenker provided, a new financial statement for Uncle Bob's dated March 1, 2009. (Exhibit 16). The new financial statement indicated that Uncle Bob's had a net worth of $1,020,919.20. Based on the representations in the financial statement, Heartland extended a further line of credit in the amount of $350,000. In the ensuing months Schlenker drew against the line of credit. As of March 11, 2011 he owed $18,908.95 in interest and $281,056.23 in principal. It is, frankly, indisputable that by this time Schlenker knew Uncle Bob's was in dire financial straits and its very survival was extremely unlikely. Although he denies it, the Court finds that Schlenker knew that the representations were false and that he hoped Heartland would rely on the false representations to advance a new line of credit.

Schlenker also obtained a credit card from Heartland. As of March 11, 2011, he owed $4,986.56 in principal, $678.65 in interest and $120 in late charges.

All amounts currently due and owing are undisputed. Schlenker also admits he signed personal guarantees in favor of Heartland to cover all indebtedness, but that he is unable to pay any of the sums due and owing. Schlenker filed for protection under Chapter 7 of the Bankruptcy Code and seeks to discharge the obligations.

It is indisputable from the record that the financial statements provided by Schlenker were materially false, that Uncle Bob's was essentially insolvent from the time Schlenker bought it,

4

and that had Heartland known of the actual financial position of Uncle Bob's and the virtual absence of any unpledged collateral to secure any of its loans, it would never have advanced credit to Schlenker. By the time GE Credit had seized all of its floor-planned trailers and Heartland became aware of Big R's ownership interest in the remainder, virtually no assets were held by Uncle Bob's that could satisfy the indebtedness. Heartland was left without any meaningful recourse for collection against anyone.

Heartland contends that Schlenker knew the financial statements supplied were false, and, therefore, discharge should be denied under 11 U.S.C. § 523. (Doc. #1). Schlenker admits the debt is due and owing on the guaranty, but asserts it is dischargeable as he had no intent to defraud. (Doc. #2).

The evidence clearly establishes that from the time Schlenker purchased the business virtually all of its assets were pledged to GE Credit, that the allegedly "consigned" assets were not owned by Uncle Bob's, and that as a result, virtually all of the assets of Uncle Bob's were double pledged to both GE Credit and Heartland.

### III. DISCUSSION

Under Title 11 Section 523(a)(2) of the United States Code, a debt may not be discharged:

> (2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by - -
>
>> (A) false pretenses, a false representation, or actual fraud other than by a statement respecting the debtor's or and insider's financial condition;
>>
>> (B) use of a statement in writing - -

5

>   (i) that is materially false;
>
>   (ii) respecting the debtor's or an insider's financial condition;
>
>   (iii) on which the creditor to who the debtor is liable for such money, property, services or credit reasonably relied; and,
>
>   (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2).

The provisions of this section should be construed to give effect to the fresh start policy of the Bankruptcy Code. Owens v. Miller (In re Miller), 276 F.3d 424, 429 (8th Cir. 2002). The creditor seeking to avoid the discharge has the burden of proof on the issue of exception to the debt discharge by a preponderance of the evidence. First State Bank of Munich v. Braathen (In re Braathen, 364 B.R. 688, 699 (Bankr. D.N.D. 2006). "Obtained by" means the fraudulent conduct occurred to induce the creditor to part with his money. Id.

It is worthy of note that claims for relief under subsections (A) and (B) of Section 523(a)(2) are mutually exclusive. Id. Subsection (A) concerns itself with false representations "other than a statement respecting a debtor's or an insider's financial condition." Under this subsection, the creditor must prove by a preponderance of the evidence (1) that the debtor made the representation; (2) that at the time the debtor knew that the representation was false; and (3) that it was made for the purpose of deceiving the creditor and was justifiably relied upon by the creditor causing a loss to the creditor. R & R Ready Mix v. Freier (In re Freier), 604 F.3d 583, 587 (8th Cir. 2010). This section prevents a person from committing an actual fraud and discharging the resulting debt. Id.

Subsection (B) covers materially false statements if a statement is (1) made in writing, (2) is materially false, (3) respects the debtor's or insider's financial condition, (4) on which the creditor to whom the debtor is liable for such money, property, or credit reasonably relied, and (5) the debtor made the publication with intent to deceive the creditor. 11 U.S.C. § 523(a)(2)(B). The creditor bears the burden of proving each element to a preponderance of the evidence in order to avoid discharge. First Nat. Bank of Olathe, Kan. v. Pontow, 111 F. 3d 604, 608 (8th Cir. 1997).

Since the case involves a series of writings submitted in loan applications by Schlenker to Heartland, and no other statements, the proper analysis is under Subsection (B). We turn to the elements in seriatim for each transaction.

    1.    <u>Were the statements of December 2009 and January 2009 made by Schlenker to Heartland materially false?</u>

A statement is materially false if it includes information which is substantially inaccurate and is of the type that would affect the creditor's decision-making process. <u>Alliant Bank v. Baker (In re Baker)</u>, 419 B.R. 47, 51 (Bankr. E.D. Mo. 2009). Trial Exhibits 13, 14, and 15 represent statements made by Schlenker to Heartland prior to the first loan. Exhibit 13 is labeled "Uncle Bob's RV Balance Sheet" and shows current assets of $7,759,329 and current liabilities of $6,627,085.28 with a net positive balance of $964,243.80. The Court finds that the net worth of Uncle Bob's is substantially overstated in Exhibit 13. Trial Exhibit 14 is equally false. It consists of an inventory list that purports Uncle Bob's was holding inventory in excess of the floor plan commitment – a so-called "Total Clear Value"– of $1,446,711.41. The Court finds that this claim is also wildly exaggerated. Trial Exhibit 15 is Schlenker's personal net worth

statement. In it he claims that he holds assets of $1,677,727.00 and liabilities of $51,276.00 for a net of $1,626,451.00. Of this net worth, he asserts that $1,234,927.00 is attributable to Hill & Zachrison, Inc. (Uncle Bob's). The evidence is incontrovertible that the statements made in December 2009 and January 2009 were materially false.

    2.    <u>Were the statements made respecting the debtor's or an insider's financial condition</u>?

The statements in question all related to the financial condition of Uncle Bob's. There is no question they were delivered by Schlenker and that they were delivered for the specific purpose of getting a loan from Heartland. Schlenker argues that he delivered the information and that he relied on his cousin, Marty Zachrison, to prepare the statements and inventories. The statements were adopted by and used by Schlenker and are, therefore, treated as his own statements and inventories. <u>Am. Gen. Fin. Servs., Inc. v. Johnson, (In re Johnson)</u>, 436 B.R. 116, 119 (Bankr. E.D. Mo. 2010). The evidence establishes conclusively that the statements were statements of Schlenker relating to his own and his business's financial condition.

    3.    <u>Did Heartland reasonably rely on the representations</u>?

Before the loans in question were advanced by Heartland, it had no business relationship with Schlenker, Uncle Bob's, or Zachrison. The testimony on Heartland's banking practices is uncontroverted. Wade Zahn testified that Heartland's standard practice was to ask for financial statements of a business seeking a loan, including a disclosure of adequate collateral for any loan, as well as personal financial statements from any principal of a business. Heartland's general practice required a personal guaranty from principals when lines of credit were extended to a business. Zahn also stated he was much more concerned with being adequately protected by

collateral in a loan of this sort because there was no prior relationship with any of the parties and the personal financial statement of Schlenker was not very impressive. He testified he was not as concerned by Schlenker's statement because Uncle Bob's inventory list showed more than three times the amount of the loan in unsecured collateral that would be available to Heartland to protect its position. Unfortunately, these numbers were cut from whole cloth.

Schlenker contends that his excellent credit rating is a likely reason the loan was extended. This posture is another example of Schlenker's complete lack of understanding of how the commercial finance world functions. A cursory review of the documents clearly indicates that neither Schlenker's financial statement (Exhibit 15) nor his credit history would sustain a $350,000 line of credit. No prudent banker would accept the personal financial statement of Todd and Becky Schlenker dated October 31, 2008, as the basis for extending a sizeable personal line of credit because there simply does not appear to be anything to collateralize the loan other than the business.

The Court finds entirely credible Zahn's testimony that Heartland's main concern was the collateral available in the inventory, as it more than adequately protected the bank's position. This is perfectly logical and consistent with ordinary banking practices. No reasonably prudent bank extends large amounts of credit to an unknown customer with no track record in business (which clearly describes Schlenker) without adequate collateral to protect its position.

The bank had no reason to doubt the representations made by Schlenker. Its reliance was reasonable and caused a change in its financial position by extending credit to Uncle Bob's and Schlenker.

    4.  <u>Did Schlenker intend to deceive Heartland in the January 2009 transaction</u>?

  The burden of proving an intent to deceive rests on Heartland. Schlenker contends that he was a naif waiting to be taken advantage of by his cousin. He claims that he was misled by Zachrison, that he was unaware of the problems brewing as result of the worldwide economic meltdown, and that he trusted Zachrison when he said that this was a way for Schlenker to own his own business and get ahead in life. Schlenker claims it seemed entirely plausible to him that his cousin would help him out by selling him a business at much less than its worth. He also denies any awareness in the period between September 2008 and January of 2009 that there were any significant floor plan financing problems with GE Credit or that he had any inkling there might be problems in the offing.

  Heartland objects strenuously to this characterization by Schlenker. It argues that Schlenker had been involved in the business for years and that he had to have known of the problems with Uncle Bob's business. Heartland argues, persuasively, that no rational human being would believe that one could buy a business worth $1.6 Million for $150,000. On this basis Heartland asserts that Schlenker must have known that problems existed—if for no other reason than because the deal was simply "too good to be true."

  Because direct evidence of intent is nearly impossible to obtain, courts are almost always left to weigh the circumstantial evidence surrounding the representation. <u>In re Lindsey</u>, 443 B.R. 808, 815 (8th Cir. BAP 2011). When the creditor introduces circumstantial evidence in support of an intent to deceive, the debtor "cannot overcome [that] inference with an unsupported assertion of honest intent." <u>In re Simpson</u>, 29 B.R. 202, 211 (Bankr. N.D. Iowa 1983). When

10

confronted with this conundrum, the test is whether the debtor's actions are so inconsistent with his self-serving statement as to cause the court to disbelieve the debtor. Lindsey, 443 B.R. at 815.

It is important to note that while a recklessly false statement can be evidence of an intent to deceive, "an inaccurate financial statement does not, by itself inexorably lead to a conclusion that the debtor intended to deceive the creditor. In re Walker, 183 B.R. 47 (Bankr. W.D.N.Y. 1995). The Court had an opportunity to observe Schlenker. His testimony leads the Court to conclude that Schlenker is a remarkably unsophisticated person. He has an apparent trust for others, particularly family, that defies ready explanation. The Court believes Schlenker when he relates that, at first, he thought that his cousin was simply "cutting him in." Frankly, Schlenker is the type of person appears to be a relatively easy mark for someone as sophisticated as Zachrison. It also appears that Zachrison saw Schlenker as a way to squeeze the very last dregs of revenue out of Uncle Bob's.

Having listened to the testimony and reviewed the documents, the Court believes that in January of 2009, Schlenker was exactly what he claims to have been—gullible and misled by his cousin. Consequently, the Court finds Schlenker was unaware on January 8, 2009, that his statements were false and, therefore, he had no intent to deceive Heartland. Heartland's objection to discharge on the note dated January 8, 2009 is Denied and Discharge Granted.

    5.    The Promissory Note dated April 16, 2009.

The analysis of the March 1, 2009 financial statement from Schlenker relating to Uncle Bob's is the same until the issue of intent to deceive is considered. Clearly, the March 1, 2009 financial statement is in writing, materially false, related to Schlenker and Uncle Bob's financial

11

condition, and was relied upon by Heartland.

By the time Trial Exhibit 16 was provided to Heartland, Schlenker's circumstances had greatly changed. By March of 2009, Schlenker clearly knew that Uncle Bob's was crumbling and that the house of cards was in the process of collapsing. He knew that GE Credit had pulled the floor plan. He knew that there were inadequate assets to provide Heartland with adequate security. Schlenker also knew that the failure of Uncle Bob's would have a profound impact on him personally and he understood that his cousin had set him up to fail. Rather than admit the hopelessness of the situation, Schlenker presented statements he knew to be materially false and did this with the purpose of causing Heartland to extend credit. Whatever Schlenker's motives were in January, by March he had a fuller understanding of how dreadfully bad things were and yet he presented documents that he knew were false— and false in a very large way.

An actual intent to deceive is logically inferred from this sort of knowledge because of the long held evidentiary maxim that one intends the natural consequences of his acts. In re Magnusson, 14 B.R. 662, 669 (Bankr. N.D.N.Y. 1981). The Court finds that Schlenker acted with intent to deceive in March of 2009. Consequently, Heartland's objection to discharge on the note dated April 16, 2009 should be Granted and discharge Denied.

      6.    The Credit Card Charges.

Heartland also objects to discharge of charges incurred by Schlenker on a credit card issued by Heartland. The state of the record is such that the Court is completely lacking actual evidence on when the credit card was issued and when the charges were incurred. Under these circumstances, Heartland has failed to meet its burden of proof. The objection to discharge of the credit card debt is Denied and Discharge is Granted.

## IV. CONCLUSION AND ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED:**

(1)  Heartland State Bank's Adversary Complaint as to the promissory note dated January 8, 2009 is **DENIED** and Debtor Todd S. Schlenker's Discharge is **GRANTED.**

(2)  Heartland State Bank's Adversary Complaint as to the promissory note dated April 16, 2009 is **GRANTED** and Debtor Todd S. Schlenker's Discharge is **DENIED.**

(3)  Heartland's Adversary Complaint as to the credit card issued by Heartland State Bank is **DENIED** and Debtor Todd S. Schlenker's Discharge is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated this 8th day of September, 2011.

/s/ Ralph R. Erickson
Ralph R. Erickson
Chief Judge, District of North Dakota